The argument this morning is United States v. Amaya Ms. Winslow Good morning, Your Honor. May it please the Court and Counsel, We've raised four issues on the appeal of this case, and I'd like to focus on the first and fourth issues, unless the Court has questions about the other two, which I'd be happy to answer. The first issue that was raised in Mr. Amaya's appeal concerns the 924C count, the use of a firearm in furtherance of a drug trafficking crime. The government's evidence failed to prove the two critical elements to prosecute this statute. First, that there was a firearm, and second, that it was carried or possessed in furtherance of a drug trafficking crime. The evidence was clear at trial that no firearm, no weapon of any kind, was ever recovered from Mr. Amaya. Instead, the government relied upon circumstantial evidence and a witness's statements that he viewed an object that looked to have the weight and feel of a firearm. This witness was, in fact, a self-proclaimed firearms expert and an agent, a law enforcement agent. He claimed that when Mr. Amaya got into the vehicle, his vehicle, that was equipped with recording and video equipment, he held an object about an inch from the agent's head, that object, he said, again, had the weight and feel of a firearm, and that while the didn't say a word. Despite the fact that there were a number of agents who were sitting within proximity and the fact that he testified there was a firearm in proximity to his head, he didn't utter a word such as... I'm not sure what nature of this argument is. Are you saying that the jury just couldn't believe what he testified to in open court? Judge, there's two parts to this argument. The first is, it goes to two issues. First of all, that it is an unreasonable conclusion on behalf of the jury, and I understand my burden there. No, no. Asking us to reevaluate jury's credibility determinations is not a highly productive appellate strategy. The more salient question here, Your Honor, is whether it was carried in furtherance of the drug crime. And as Your Honor is aware, this court has a number of different factors to be considered in whether a firearm was carried in furtherance of a drug crime. One of those factors, and this is where this evidence is most relevant, is the question of the type of drug activity that's being conducted. And this is coming from the United States v. Eller case that's cited in the brief. In this case, Mr. Amaya got into a car, a vehicle, with individuals who he believed to be friendly. He believed them to be his friends, whether he knew some of them well, in fact, he knew some of them for years and years. And then there was the undercover agent. The undercover agent was acting as a Latin King Gang member. And when Mr. Amaya got into the car, there was an exchange of handshakes, which the agent testified was a showing of respect and friendship. And so the consideration of how this weapon was displayed, or how it was discussed if such a weapon was displayed, is relevant to the consideration of whether or not it was of a drug crime. In essence, or in short, there was no reason for Mr. Amaya to bring a weapon to this particular meeting. They were friendly. There was no hostility. There was no need to protect himself from anything other than some other gang, rival gang members. Now, was that argument made to the jury? Yes, it was. Yes. And the jury rejected that argument? The jury rejected it. The question here is whether it meets the legal test for in furtherance. As this Court's well aware, the mere... But you're not contesting the jury instruction that defined in furtherance. I'm not, Your Honor. But this Court can certainly still consider whether or not the evidence as submitted was sufficient. Well, we've held the gun in a closet where drugs were kept as in furtherance. You've also held, this Court has also held, that the mere presence of a firearm at or near a drug transaction is not necessarily sufficient in the United States. Not necessarily. That's why it's a jury question. That's correct, Your Honor. There are two questions in this case. One is whether or not the government established that the weapon was carried in furtherance. And the second is whether the government established that there was a weapon. And back to that issue. The question with respect to whether there was a weapon is not a credibility issue. It's the question of whether there was sufficient evidence to establish that this object, such as if there was one, was capable of expelling a projectile. So you're saying even if the jury... So it's not an issue of the credibility of the agent. It's even if the jury believed the agent that it was, you know, a big gun, there was some reference, he made some statement afterwards, that that isn't enough. That's correct. That that wasn't enough. The definition... Justice's testimony was not enough to show that it could be fired and it was a real weapon. That is precisely the point, Your Honor. The government has relied upon United States versus Moore, and that was cited in their supplemental citation of authority. In United States versus Moore, although the firearm was not recovered, there was testimony that there was, the witnesses were able to see bullets being taken in and out of the weapon. That evidence is exponentially stronger than this case, where there was no evidence at all that this weapon could be fired, that it could be an object that would expel a projectile as is required by the statute. If there was no... There was testimony that... There was no testimony that this object, that this object, if it was a firearm, could expel a projectile, none whatsoever, Your Honor. If there's no further questions about that particular issue, I'll move on to the second, well, really the final issue as it's presented in the brief, and that is the sufficiency of the evidence with respect to the recode allegations. This case is a sort of a follow-up to a number of recode prosecutions, gang prosecutions. It was a recode prosecution with a single defendant related to the United States versus Zambrano case. And the indictment in this case, the same as the Zambrano... Let me go back just a second. Please. There was an audio recording that talked about expelling the... It didn't, as a matter of fact. In fact, Your Honor, what that audio recording said or what it reflected was that he stated that the boys used it in the hood. There was no... There's nothing more specific than whether or not it was used in the hood. And I will respectfully return to that audio recording. There's no evidence that would suggest, would support a finding, a reasonable jury finding, that that was the same firearm we're talking about. Now, the recording that you're referring to is, I believe, on November 3rd, and the charge is the use of a firearm in furtherance of a drug trafficking crime on September 23rd. In that recording, Mr. Amaya says something along the pistol that I had the other day. I think it's a stretch to say that the other day is September 23rd when you're having this conversation on November 3rd. But there was no other meeting of them, was there? No. But the other part of that recording that's relevant to that question... There was a third, but it was subsequent. Right. That's what I mean. And there was only one meeting, so... But, Your Honor, the other part of that recording that's significant to that question, to Your Honor's question, is that he, Mr. Amaya, is not sure that these are the same individuals to whom he showed the pistol. He said, that was you guys, right? He doesn't remember whether or not it was the same individuals, suggesting, maybe not so much to the credit of my argument, suggesting that he could have had a meeting with other Again, though, I think the relevant question for the 924C is that there's no evidence that this weapon was possessed in furtherance of a drug crime. It did nothing to further the drug crime. It was merely present at the time of a drug transaction. And Mr. Amaya has never seriously contested the fact that there was a drug transaction, just that the firearm was possessed in furtherance of that transaction. If there's no further questions on that issue, I'll return to the RICO. The RICO allegation, or the RICO charge in this case . . . And let me just clarify, back to the gun. You concede that the defense opened the door to the testimony that the agent gave about the gun, because on cross-examination, the defense counsel said, you know, there's nothing on the tape that makes any reference to the gun. And the agent is really careful, because he knows about the pretrial ruling, and he says, not at that instant, no. Not at that instant, no. With all due respect to the court's ruling, and we have raised this issue on appeal, it is one of the other two issues that I won't spend a lot of time focusing on. The question that I ask, because I was trial counsel, is whether or not the agent made any exclamation or statement at the time that Mr. Amaya was in the car. I don't think that that opened the door to statements that followed his exiting the vehicle. And the reason that I maintain that position is, it's unreasonable for the agent to have not . . . to have failed to make a statement while Mr. Amaya was in the car. If his testimony was true, if his testimony was to be believed, the danger to him occurred while Mr. Amaya was in his car, and the after-the-fact statements add nothing other than essentially hearsay, in this case, because they did also rely on the statement of the informant who was not present. Now, you know about the pretrial ruling, and this question that you ask, because here's your quote, despite the fact that you're aware that your vehicle is equipped with recording equipment, you don't say anything about the gun, is that right? So, I mean, you knew you were playing with fire. I knew I was very close to the line. So, the question is, you know, when you want to ask a question like that, could you have asked for a sidebar before you put that question to the witness and determined whether or not the court would have let all that other testimony in? Judge, there was a great deal of discussion between myself and co-counsel as before I asked that question. Okay. I knew what could . . . You knew what your options were. I knew . . . Okay. And I believed at that time, and as a matter of fact, I continue to believe that it was still the right thing to do . . . I understand. . . . to ask that question. I understand. So, for what that's worth. Returning to the question of the RICO indictment. There were a number of specific predicate acts that were charged in the indictment. That includes drug trafficking, murder, attempted murder, conspiracy to commit murder, and extortion. And in this case, the government's evidence failed to prove that Mr. Amaya, either personally or by conspiracy, engaged in those predicate acts. I'd like to begin with the drug transactions because the government relied in part on the 2010 drug transactions to prove predicate acts. Mr. Amaya was expelled from the Latin Kings in 2008 because he had some interpersonal disputes, shall we call it, with the Corona, the leader of the Latin Kings. He was removed from his leadership role and, in fact, removed from the gang at that time. He continued to associate himself peripherally with Latin Kings, but at the time that this transaction occurred in 2010, the record is clear that he had moved out of Latin King territory and was actually living in rival gang territory. He entered into a vehicle with, as I said, somebody he had known. It's not in the record, but somebody he had actually . . . it was one of his former cellmates. And an individual who was portraying himself as a Latin King gang member. That individual was an undercover agent. The government argued in its closing argument that the conspiracy to distribute drugs as a predicate act could be established by Mr. Amaya's conspiracy with the undercover agent. I think the law is clear that one cannot conspire with an undercover agent. I see that my light has come on and all of these issues are addressed in the brief. If there's no specific questions, I would like to keep some of my time for rebuttal. Thank you very much. Ms. Greenwald. Good morning, Your Honors. Initially, addressing the 924C conviction, I just want to be clear that the argument that an unreasonable conclusion reached by a jury in this case was never raised in their opening brief, their reply brief. It involves even more strenuous standards of review by this Court than a sufficiency of the evidence. And I think by the end of her argument, she'd moved on to the sufficiency anyway. So I just want to be clear. I don't think that . . . not that the defendant could prevail on that, but I don't think that's really the argument being made of unreasonable conclusion by the jury. Focusing on the arguments that are raised in terms of the sufficiency of the evidence that the weapon was designed to or readily converted to expel a projectile, first of all, the law is clear that the weapon itself does not have to be retrieved and introduced in death. And cases cited in our brief, including the Fifth Circuit decision in Longford, which was a Violence Against Women's Act case but did involve a 924C charge, and the Jones case, which is a Second Circuit case, make it clear that lay witness testimony by itself is sufficient. In both those cases, you just had lay witness victims, one case to a kidnapping, another case to a bank robbery, saying, I saw a gun. And that was sufficient. But in this case, that's not all we have here. I mean, here we do have an experienced, not self-proclaimed expert, an experienced law enforcement officer, experienced investigation of guns, who testified that the defendant displayed a silver automatic pistol less than a foot from his face. He testified it looked to have the weight and feel of a handgun, and he testified he was positive it was a real gun. In addition to that . . . Now, in terms of the weight and everything, that's from his observation because he never held it. That's his observation. Absolutely, Your Honor. And another, you know, they're saying that for this particular deal, the defendant thought he was with friends, not an undercover agent or a CI, so his possession was unrelated to the drug sale. In terms of the in furtherance argument? Yes. He was in rival . . . I mean, this particular transaction has to be looked at in the context of all the other evidence in this case. And the evidence in this case was that in the little village neighborhood of Chicago, in this Latin Kings territory, there were rules, there were lifestyles, there were practices that involved you don't go into rival gang territory unless you're armed. And if people from rival gang territory come into your section, they're armed. He was in rival gang territory, he was conducting a drug deal, and he was walking where he both on tape, and this is all on tape, was coming through an alley where rival gang members were. And he's carrying cocaine. And he's going to a deal where he identifies himself as a Latin King, he believes he's dealing with another Latin King, he sells his drugs, and he's leaving, walking through this same alley where he is on tape both during this deal and the later deal talking about how that's a hangout for rival gang members. So our argument on in furtherance is that, yes, he was carrying that weapon to protect himself, a Latin King, an identified Latin King, and the evidence is clear about how they're identified, both through tattoos and clothing, other things that identify you as a Latin King, that he's trekking through this neighborhood with these drugs, with drug proceeds, and he's carrying a gun to protect himself. And, in fact, when he presents the gun, and this is heard on tape, and he's pointing it in the direction of the alley on the September 28th date, he says, I'm going to say the exact quote because I'll be waiting for their asses as he's pointing it towards these rival gang members. In addition, Your Honor, our argument about in furtherance is that he believes, his belief is he's meeting with another Latin King. That's who he believes he's meeting with. And this Latin King knows they're meeting in rival gang territory. The defendant himself has pointed it out. He wants to assure him, I can conduct this deal. I can protect this transaction. So, on both levels, it's clearly in furtherance. And I would just also point out, in terms of it being a firearm, meeting the definition of a firearm, what happens is less than a month later, meeting with this undercover agent, in the exact same location, the defendant talks about, refers to the rival gang members in the same area, and he says, remember, quote, I pulled out that other pistol. He does say, you know, that was you. Well, it was them, unless he's constantly meeting with people in that location and pulling out pistols. And he also tells the undercover agent that he'd gotten rid of that pistol that he had, and this is quote, showed, S-H-O-W-E-D, showed them. He's talking about the pistol he showed them, and that at the prior meeting, and that he got rid of it by having it dumped and chopped up. And I'm adding the E-D, but dump and chop is in his thing, because some boys in the hood had, quote, unquote, used it. And that's all in Government Exhibit 5. And, again, looking at that testimony in the context of the entire case, the testimony of two longtime leaders, longtime leaders in the gang in the Latin Kings, was that when guns had been used in the hood in a shooting, and particularly in a killing, but in a shooting in general, those guns were dumped. They were chopped up. They were destroyed, so they couldn't be brought back and tied back to the gang. And after also talking about having chopped up, gotten rid of the gun, he then asked this undercover agent if he could get him, again, quote, handguns. The defendant asked for the handguns. So I believe all this evidence topped off by the testimony of the cooperators, longtime gang members, that you don't go in to rival gang territory. You don't go in these neighborhoods without real guns. You don't carry toy guns. It was overwhelmingly enough to establish that it was qualified as a weapon. I want to just ask you one other question about the Corrin and the defense counsel opening the door, because clearly the door was open, or at least that was the court's position. I know it's your position that the door was open. Yes. And so the question is the CI statement. Yes. You know, because the theory was that it was Corrin's response that should have been admitted because the question was, well, you never said anything while you were in the car about it. Yes. So why was that not a harmful error to let the CI's question in? Well, two reasons. First of all, they do put in the agent's statement that it was a pistol. But then on the redirect, you're right, Your Honor, they put in the agent's initial statement, they put in the CI's statement, and they don't put in the hell yeah by the agent afterwards. But they immediately correct that. I don't think that the agent or the prosecutor, in fairness to them, were prepared for that kind of redirect because they didn't expect this to come in. So I think the government, though, quickly corrected it within two witnesses by introducing the entire conversation on tape and in transcript form that included the CI's statement and the undercover agent's statement. So it was immediately corrected, and to the extent there was still error there on the record, it was beyond a reasonable doubt harmless because the evidence, as I say, that there was a gun, which is the only thing this went to, was overwhelming. Overwhelming that even on the sufficiency of the evidence, there's no dispute that a pistol, whether it was toy or real, may have been in dispute. And I'm not saying in the trial court they disputed whether there was a gun, but I'm saying even on appeal there's no sufficiency raised as to whether the jury got it wrong that something was shown. It's just a question of whether we proved that it was a real gun. But even if you go to all of that, I just think the evidence that I went through just a minute ago, including the defendant's own statements, is that it's overwhelming. And as I say, it was corrected relatively quickly and pretty slam-dunk on the record corrected in the sense that we put in the transcript, we put in the recording so the jury actually heard the words. And moreover, we never argued, they never argued, the government never argued this for the truth of the matter or even referred to the CI's statement. It was only raised in rebuttal in response to the defense claim that the agent had never said anything, and it was pointed out that he had, but it was never offered for the truth. Moving on, though, to the RICO conspiracy and the evidence. So did the court give an instruction on it as to how it should be used? No, Your Honor, no request was ever made of that. It wasn't, that hasn't been raised as an issue on appeal either, but no, no instruction was given. As far as the RICO conspiracy, and basically the argument there is that the evidence failed to show that the requisite agreement by the Defender-Commissioner of at least two predicate acts. And again, this is a conspiracy case, so it's the agreement, the acts don't have to have been committed, he doesn't have to have participated in them, and moreover, this is also charges in aiding and abetting a conspiracy. But addressing the drug trafficking in particular, what defense counsel focuses on these two last drug deals in 2010, and they're of course important to the government's argument, but I think again, drug trafficking has to be looked at in the scheme of the conspiracy itself and the whole racketeering enterprise. And the drug trafficking was an integral part of the racketeering conspiracy, and the Defendant was in support of and in full agreement with that as being important acts and part of this conspiracy. And you can see that not only by the fact that he, when he went to the drug deal, you know, he identified himself as a Latin King, and he met with a Latin King, and the gang therefore provided a shortcut method to know who you could trust to buy things from, to deal with. But it's also true because the Constitution and the rules of the gang regulated what drugs could be sold and couldn't be sold. It forbade gang members from taking narcotics on credit from another gang member. And as regional Inca, it was the Defendant's responsibility to not only know this, but to enforce it, because if disputes came up in VAW, and this is in the record, if disputes came up in VAW regarding drug dealing and things, it was the Inca's job, the regional Inca's, to address that. And moreover, not only did gang members earn money to pay their dues from drug trafficking, while Defendant was a regional Inca, you could get a break from having to go to these bust-outs if you gave more money. If you were a drug dealer and you needed to miss a bust-out in the neighborhood, the mandatory bust-outs, in order to go do a drug deal, you could pay more dues, more dues that, by Defendant's own admissions, he was going to use to buy ammunition to support the activities of the gang. So it's not just, I mean, certainly those two instances are important. And they're also important because during those instances, he seeks to buy guns or get guns from the undercover agent. But they're also important in the context of the whole case. And that's what I would just urge the Court to do, as it does, is look at it in the context of the whole case. So unless the Court has any other questions or issues, we would rest on this argument today, as well as the arguments in our brief, and respectfully ask that the Court affirm the conviction itself. Thank you. Ms. Greenwald, anything further? Ms. Winslow? Briefly. With respect to the government's argument regarding the in-furtherance aspect of the 924C, the government relied repeatedly throughout their argument, throughout the trial, and throughout the briefing, on the notion that there were rival gang members in the area. From looking at the argument as a whole, that's virtually a concession that this weapon was not carried in furtherance of a drug trafficking crime. Robbery of rival gang members is not part of the equation. There was no evidence that robbery was one of the goals of rival gang members. In fact, threats to personal safety, and not robberies, not interpersonal robberies, was the concern here. So when Mr. Amaya says on the tapes, I got something for the asses, or the like, he's not talking about protecting his drugs. He's talking about protecting his own personal security. There's no connection between this weapon and the underlying drug transaction. Moreover, there's really no evidence, and it's pure speculation, to suggest that this weapon was brought to make the other individuals in the car feel more comfortable. Mr. Amaya refers repeatedly to walking back and forth in the alley where the young members of a rival gang play basketball, and that that put him in some personal... So carrying weapons is really just sort of incidental to a drug transaction in Chicago? In this instance, it is, Judge. In this instance, in light of the nature of the drug transaction, in light of the factors that this court instructs courts to consider under Eller, it is incidental. In fact, the consideration at stake here is Mr. Amaya's personal safety and not the drugs, and not potential robbery. With respect to the RICO, the government, again, and this is in our brief, the government refers to the rules and the nature of conduct that was expected by members of the Latin Kings. What it doesn't prove is any particular drug transaction during the period of time that Mr. Amaya was regional inca. What it doesn't prove is any murder, attempted murder, conspiracy to commit murder. There is no particular predicate act ever proved. There's no evidence of any murders throughout this period of time. And by the time Mr. Amaya was involved in the drug transactions in 2010, he was, again, years away from being regional inca, had moved out of the neighborhood, and had really only a peripheral involvement with the gang. If there's no other questions, I'll rest on the brief. Thank you very much. Thank you very much, Ms. Winslow. And Ms. Winslow, we appreciate your willingness to take the appointment in this case and your assistance to the court as well as your client. Thank you, Your Honor. The case is taken under advisement.